**STATE of Missouri, Plaintiff–Respondent,**

v.

**Harold R. LINGLE, Defendant–Appellant.**

No. 24812.

Missouri Court of Appeals,
Southern District,
Division Two.

June 16, 2004.

Motion for Rehearing or Transfer to Supreme Court Denied July 8, 2004.

Application for Transfer Denied Aug. 24, 2004.

Craig Johnston, Asst. State Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Andrea Mazza Follett, Asst. Atty. Gen., Jefferson City, MO, for respondent.

JEFFREY W. BATES, Judge.

Harold R. Lingle ("Defendant") was charged by information with five counts of committing the class A felony of murder in the first degree, in violation of § 565.020.[1] These five charges stemmed from the strangulation deaths of Erin Vanderhoef ("Vanderhoef") and her three children: Darlene Vanderhoef, Jimmy Vanderhoef and Christopher Franklin ("the children"). The evidence presented at trial showed Defendant and two other individuals, Richard DeLong ("DeLong") and Stacie Leffingwell ("Leffingwell"), collectively planned and carried out these five murders.[2] A jury found Defendant guilty on all five counts, and he received five concurrent sentences of life imprisonment without the possibility of probation or parole. In Defendant's appeal, he contends the trial court erred by failing to order Delong

---

1. All references to statutes are to RSMo (2000).

2. Vanderhoef was pregnant when she was killed. Her asphyxiation resulted in the death of her unborn child, Hannah. Therefore, a total of five victims were murdered.

to testify on Defendant's behalf and by overruling Defendant's request for a mistrial after the State had concluded the first portion of its closing argument. We affirm.

## I. Statement of Facts

Defendant does not contest the sufficiency of the evidence to support his convictions. Therefore, a brief review of the evidence adduced at trial, viewed in a light most favorable to the jury's verdicts, will be sufficient. *See State v. Starr*, 998 S.W.2d 61, 63 (Mo.App.1999); *State v. Rowe*, 838 S.W.2d 103, 106 (Mo.App.1992).

In January 1999, DeLong, Leffingwell and their son, Scooby, were living together in an apartment in Joplin, Missouri. Defendant and his wife lived in the same apartment complex. Vanderhoef lived in a house in Springfield, Missouri, with her children.

Leffingwell was DeLong's current girlfriend, but he previously had been romantically involved with Vanderhoef. In 1998, Vanderhoef periodically came to Joplin and sought to reestablish her prior relationship with DeLong. On some occasions when Leffingwell was out of town, Vanderhoef engaged in sexual relations with DeLong. Leffingwell, who was dying from AIDS, was furious with Vanderhoff for pursuing DeLong and attempting to replace Leffingwell as Scooby's mother.

DeLong and Leffingwell came to Defendant's apartment on Monday evening, January 18, 1999. While there, they told Defendant they intended to go to Springfield the next day and kill Vanderhoef in order to get her out of their lives. Because her children would be witnesses to the event, DeLong and Leffingwell also intended to kill the children. They asked Defendant if he wanted to participate. He initially de-

clined, but he changed his mind when DeLong said he would give Defendant an "8 ball" of methamphetamine in exchange for helping to kill Vanderhoef and her children.[3]

On Tuesday, January 19, 1999, Defendant drove to Springfield with DeLong and Leffingwell. During the trip, the three discussed what methods they could use to kill the children. Defendant did not want to participate in murdering the children, so DeLong and Leffingwell proposed that he take Vanderhoef to the store to keep her occupied while DeLong and Leffingwell killed her children. Defendant agreed to do so.

When Defendant, DeLong and Leffingwell arrived at Vanderhoef's house in Springfield, she and the children were all there. As planned, Defendant took Vanderhoef to Dillon's Supermarket while DeLong and Leffingwell strangled the three children. When Defendant and Vanderhoef returned to her house, DeLong told her the children had been disciplined and were in their rooms. While Defendant and Vanderhoef sat beside each other on the couch watching television, DeLong moved behind Vanderhoef on the pretext of putting a necklace on her. As he attempted to wrap a cord around Vanderhoef's neck, she resisted by grabbing at the cord. She and Defendant fell off the couch onto the floor. Vanderhoef was able to resist being strangled until Defendant grabbed her hands and pulled them down to her waist. By doing so, Defendant gave Leffingwell the opportunity to stuff a rag in Vanderhoef's mouth so she could not scream. DeLong and Leffingwell then tightly wrapped the cord around Vanderhoef's neck and tied it off. Defendant continued to hold Vanderhoef's hands at her waist while she struggled. After

**3.** An "8 ball" of methamphetamine is comprised of four packages of the drug.

about 10 minutes, Vanderhoef passed out. DeLong and Leffingwell bound Vanderhoef's feet with another cord, pulled them up tightly behind her back and wrapped the end of this cord around her neck so the weight of her feet and legs would help suffocate her. It took another 10 minutes for Vanderhoef and her unborn child to die from asphyxiation. After committing these murders, Defendant, DeLong and Leffingwell returned to Joplin. Later that evening, DeLong gave Defendant the promised "8 ball" of methamphetamine for participating in the murders, and Defendant used these drugs.

Additional facts will be provided when necessary to our analysis of the two points presented by Defendant's appeal.

## II. Discussion and Decision

### A. Point I

In Defendant's first point, he contends the trial court erred in not ordering DeLong to testify on Defendant's behalf. This contention of error arose in the following fashion.

After Defendant was arrested, he gave a videotaped statement to police. During this statement, Defendant admitted planning the five murders with DeLong and Leffingwell and agreeing to participate in exchange for drugs. Defendant also admitted holding Vanderhoef's hands down at her waist while DeLong and Leffingwell strangled her. Later in this statement, however, Defendant claimed he only helped strangle Vanderhoef because DeLong threatened to kill Defendant if he did not help. Defendant also said that after he and DeLong returned to Joplin on the day of the murders, DeLong threatened to kill Defendant if he told anyone what they had done.

Prior to the beginning of Defendant's trial, DeLong already had been tried and convicted of five counts of first degree murder. Although DeLong gave a videotaped statement to the police, he did not testify at his own trial. Before Defendant's trial began, his attorneys sought to depose DeLong. During this deposition, DeLong refused to answer any questions. At trial, DeLong was the first person called as a witness during Defendant's case. Defense counsel asked for a hearing out of the presence of the jury because "[w]e've previously tried to take his deposition, and he refused to answer my questions.... So I would ask that Mr. DeLong be brought into the courtroom so we can determine what his intentions are with respect to giving testimony in this courtroom today." The trial court granted this request. Thereafter, defense counsel, Ms. Beimdiek, elicited the following testimony from DeLong:

Q. Would you state your name, please?

A. Richard Ivan DeLong.

Q. Richard DeLong? You're the same Richard DeLong who's been convicted of five counts of murder in the first degree?

A. Yes, ma'am.

Q. And you're currently serving five life-without-parole sentences in the Missouri Department of Corrections?

A. Yes, ma'am.

Q. All right. And I want to ask you some questions about the events that occurred on January the 19th, 1999, in Springfield, Missouri.

A. Okay.

Q. All right. Specifically, I want to ask about some threats that you made to Mr. Lingle during the course of those events. Can you tell this Court whether, in fact, you made any threats to Mr. Lingle dur-

ing the course of the events of January the 19th, 1999?

A. I'd rather not even talk about it, really. I mean—sorry.

Q. Are you asserting any kind of a privilege in refusing to answer my questions, or are you simply stating that this is a preference that you have not to talk about this?

A. Just a preference, ma'am.

MS. BEIMDIEK: Your Honor, given that, I would ask that Mr. DeLong—ask a follow-up question.

Q. (By Ms. Beimdiek) Are there any questions, Mr. DeLong, that I could ask you here today that you'd be willing to give me an answer to about the events that took place on January the 19th, 1999, and the days following?

A. No, ma'am.

After this exchange took place, defense counsel asked the trial court to instruct DeLong to answer her questions. The prosecutor then elicited the following testimony from DeLong:

Q. Mr. DeLong, you don't know exactly what the Fifth Amendment privilege against self-incrimination is, do you?

A. No, sir.

Q. And that's the same answer you gave us at your deposition quite a while back?

A. Yes, sir.

Before issuing a ruling, the trial court heard arguments from defense counsel and the prosecution while DeLong was still on the witness stand. The prosecution argued DeLong's statements, taken as a whole, sufficiently manifested an intention not to testify that invoked his Fifth Amendment rights.[4] In particular, the prosecution noted DeLong still could incriminate himself by being compelled to testify about what took place on January 19th. If DeLong admitted giving Defendant methamphetamine for participating in the murders, DeLong could be charged with distribution of a controlled substance in Jasper County. Defense counsel argued DeLong's use of the word "preference" was not an invocation of any Fifth Amendment privilege; however, she did not respond to the prosecutor's argument that DeLong could incriminate himself if he admitted giving Defendant methamphetamine for participating in the murders. At the conclusion of these arguments, the trial court asked DeLong one additional question and then issued its ruling:

THE COURT: Mr. DeLong, even if I ordered you to testify, would you still just prefer not to talk about it and not say anything about it?

THE WITNESS: Yes, sir.

THE COURT: Okay. I'm not going to order [DeLong] to testify. It's clear that he would not testify. He probably does have the right to refuse to testify under the Fifth Amendment, and so I am not going to order [DeLong] to testify.

Defendant claims the trial court's refusal to order DeLong to testify was an abuse of discretion because his testimony "might have supported" Defendant's diminished capacity defense. For the following reasons, we disagree.

### 1. DeLong Would Not Have Testified Even If Ordered to Do So

A trial court is vested with broad discretion regarding the admission and ex-

4. The Fifth Amendment to the United States Constitution states, in pertinent part, that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...."

clusion of evidence. *See State v. Mayes,* 63 S.W.3d 615, 627 (Mo. banc 2001). We will reverse only upon a showing that the trial court's ruling constituted an abuse of its discretion. *Id.* "An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Hancock v. Shook,* 100 S.W.3d 786, 795 (Mo. banc 2003). "If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *State v. Biggs,* 91 S.W.3d 127, 133 (Mo.App.2002). We conclude the trial court did not abuse its discretion when it declined to order DeLong to testify on Defendant's behalf. Based on the specific facts and circumstances existing when this ruling was made, it is evident to us, as it was to the trial court, that DeLong would not have testified for Defendant even if ordered to do so.

Prior to being called as a witness by Defendant, DeLong had never given any testimony under oath concerning the murders. He had not testified at his own trial. He had refused to answer any questions at a pretrial discovery deposition taken by Defendant's attorneys. When summoned as a witness by Defendant at trial, DeLong persisted in his adamant refusal to testify concerning any aspect of the murders. He bluntly informed defense counsel that he would not willingly answer "any question" concerning the murders.

The trial court made its ruling with knowledge of the foregoing facts and after personally observing DeLong while he was questioned by defense counsel. The trial court made a factual determination that DeLong would not testify even if ordered to do so. As the court stated, "It's clear that he would not testify." If DeLong had been ordered to testify and refused to do so, the only coercive tool available to the trial court would have been to find DeLong in contempt and fine or jail him until he decided to answer. *See* § 476.110(5); § 476.120. As DeLong was already serving five life sentences without the possibility of probation or parole, it was not an abuse of discretion for the trial court to conclude that ordering DeLong to testify would have been futile.[5] Under the circumstances present here, DeLong's characterization of his decision not to testify as a "preference" does not alter the fact that he was, in fact, refusing to testify and that the trial court lacked any effective means of compelling him to do otherwise.

2. *DeLong Sufficiently Invoked His Fifth Amendment Privilege Against Self-Incrimination for Distributing a Controlled Substance in Jasper County*

As an alternative ground for denying defense counsel's request that DeLong be ordered to testify, the trial court also relied upon the witness' Fifth Amendment privilege against self-incrimination. We agree with the trial court that DeLong's refusal to testify about the murders was sufficient to invoke this right and that DeLong's testimony about certain pertinent aspects of the murders could have exposed him to additional felony charges

---

5. Defense counsel recognized this to be true when they later attempted to offer, through Dr. Wetzel, evidence of threats against Defendant that DeLong had reported during an interview by another physician. During this subsequent offer of proof, counsel reminded the trial court that "we've attempted to adduce this evidence from the maker of the statement, and as the Court just saw, that witness, Richard DeLong, is not available to us."

for distributing a controlled substance in Jasper County, Missouri.

In *State v. Booth,* 11 S.W.3d 887 (Mo.App.2000), we summarized the principles that govern the applicability of the privileges against self-incrimination contained in our federal and state constitutions:

> The privilege against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and Article I, section 19 of the Missouri Constitution. The privilege protects an individual from being an involuntary witness against himself in any proceeding, criminal or civil, formal or informal, where his answers might incriminate him in future criminal proceedings. The privilege extends not only to answers that would completely reveal guilt of a crime, but also to questions whose answers might reveal facts which could be a link in a chain of evidence connecting him to a crime. Once a witness invokes his constitutional privilege against self-incrimination, a rebuttable presumption arises that his answer might tend to incriminate him. This presumption can be rebutted by a demonstration by the questioner that the answer cannot possibly have a tendency to incriminate the witness. Only after the questioner makes such a demonstration may a court compel an answer to the question in derogation of the privilege against self-incrimination.

*Id.* at 893–94 (citations omitted). The determination of whether a claim of privilege is proper rests within the sound judgment of the trial court. *State v. Sanders,* 842 S.W.2d 170, 173 (Mo.App.1992). A trial judge is given "wide latitude" in making this determination. *State v. Carey,* 808 S.W.2d 861, 865 (Mo.App.1991). "All the trial court is required to do is make an adequate record that the privilege against self-incrimination will be invoked by some reliable and certain means." *Id.* at 866. We review only for an abuse of this discretion. *Id.* at 865.

At the trial, defense counsel argued DeLong's characterization of his refusal to testify as a "preference" meant he was not invoking his Fifth Amendment rights. We interpret defense counsel's argument to mean DeLong was waiving any right he had to assert the privilege. In deciding whether this was true, the trial court was obligated to indulge every reasonable presumption against a waiver and not declare that DeLong had waived his privilege against self-incrimination unless it clearly appeared he intended to, and did, knowingly waive his rights. *See Booth,* 11 S.W.3d at 894; *Williams v. Gary Breedlove Const., Co.,* 950 S.W.2d 557, 561 (Mo.App. 1997); *State v. Cavanaugh,* 419 S.W.2d 929, 936 (Mo.App.1967). Defense counsel's argument was at odds with DeLong's statement that he really did not understand—either at trial or when his deposition was taken—what his Fifth Amendment privilege against self-incrimination was. It is abundantly clear, however, that DeLong consistently had refused to give any testimony concerning the murders on either of these occasions. A witness can invoke his Fifth Amendment rights by the act of refusing to testify. *See State v. Whitfield,* 939 S.W.2d 361, 368 (Mo. banc 1997) (noting that witness called by defendant in Rule 29.15 proceeding "invoked his Fifth Amendment privilege against self-incrimination at the hearing by refusing to testify").[6]

---

6. In arguing DeLong should have been compelled to testify, Defendant principally relies on *State v. Sanders,* 842 S.W.2d 170 (Mo.App. 1992). There, Sanders and Montgomery were each charged with murdering the victim. The Eastern District held the trial court

The prosecutor argued DeLong's refusal to testify was sufficient to invoke his privilege against self-incrimination. It is evident the trial court accepted this argument. Once the privilege was invoked, a rebuttable presumption arose that DeLong's answers might tend to incriminate him. Therefore, the trial court could not compel DeLong to testify unless Defendant rebutted this presumption by demonstrating the witness' answers could not possibly have a tendency to incriminate him. *See Booth*, 11 S.W.3d at 894.

We conclude Defendant failed to rebut this presumption. If DeLong's invocation of his privilege against self-incrimination had "any rational basis," the trial court could not compel DeLong to testify. *See Whitfield*, 939 S.W.2d at 368–69. We find such a rational basis in the argument, advanced by the prosecution, that DeLong's testimony could incriminate him if he admitted giving Defendant methamphetamine for participating in the murders.

When DeLong was called as a witness at trial, Defendant's videotaped statement to the police had been introduced in evidence. In this statement, Defendant told the police that DeLong gave him an "8 ball" of methamphetamine for participating in the murders. Defendant's statement was corroborated by witness Karen Chambers, who testified that on the afternoon of the day the murders were committed (January 19, 1999), she observed DeLong and Defendant standing in Defendant's bedroom in his apartment in Joplin. She saw DeLong give Defendant two small packages containing white powder and tell Defendant "this was payment for something that he did." If DeLong had been compelled to testify for Defendant, the State would have been entitled to cross-examine him as to the entire case. *See* § 491.070; *State v. Gardner*, 8 S.W.3d 66, 72 (Mo. banc 1999) (Section 491.070 authorizes cross-examination on the entire case, which means "the whole case and nothing less"). Therefore, DeLong could have been cross-examined about whether he gave Defendant methamphetamine for participating in the murders to refute the assertion that Defendant participated in the murders only because he was threatened by DeLong.[7] DeLong's compelled admission that he had given Defendant methamphetamine as payment for committing the murders would tend to incriminate DeLong for distributing a controlled substance in Jasper County.[8] At

---

erred in not compelling Montgomery to testify at Sanders' murder trial. We find *Sanders* distinguishable for two reasons. First, at the time Montgomery was called as a witness, he had pled guilty to murder and been sentenced to life imprisonment. Therefore, he knowingly waived his Fifth Amendment privilege against self-incrimination as to the details of the murder for which Sanders was on trial. *Id.* at 174. Here, DeLong was convicted after trial; he did not plead guilty. Second, Sanders' defense counsel made an extensive and detailed offer of proof concerning the specific questions he intended to ask Montgomery, which established the relevancy and materiality of the anticipated testimony. *Id.* at 172–73. The same is not true here. *See* § II.A.3 of this opinion, *infra*.

7. On appeal, Defendant argues the trial court could have prohibited this line of cross-exami-

nation because it was collateral. We cannot consider this argument because it was not presented to the trial court. *See State v. Winfield*, 5 S.W.3d 505, 515 (Mo. banc 1999) (a party is bound by the arguments made before the trial court and cannot raise new and totally different arguments on appeal). In any event, we are hard pressed to see how evidence of motive is collateral since it bears directly on the central issue of deliberation. *See State v. Beck*, 785 S.W.2d 714, 717 (Mo. App.1990) (if a party is entitled to prove a fact as part of his case for any purpose independent of contradiction, it is not collateral).

8. Methamphetamine is a Schedule II controlled substance. *See* § 195.017.4(3)(b). Distribution of methamphetamine is a class B felony. *See* § 195.211.3. The statute of limitations for a class B felony is three years. *See*

trial, defense counsel made no effort to demonstrate how DeLong's answers could not possibly incriminate him and expose him to additional prosecution for this new felony offense. Accordingly, the trial court did not abuse its discretion in denying, on Fifth Amendment grounds, Defendant's request that DeLong be compelled to testify on Defendant's behalf. "While we agree that the constitution guarantees criminal defendants the right to offer testimony of witnesses in his favor, a validly-invoked fifth amendment privilege of the witness prevails whenever these two rights conflict." *State v. Grays*, 856 S.W.2d 87, 92 (Mo.App.1993).

### 3. No Adequate Offer of Proof Was Made

 Another reason we must affirm the trial court's decision not to order DeLong to testify is the absence of an adequate offer of proof at trial. An offer of proof serves two purposes. First, it allows the trial judge to further consider the claim of admissibility after having ruled the evidence inadmissible. Second, it preserves the evidence so an appellate court can understand the scope and effect of the questions and proposed answers in considering whether the trial judge's ruling was proper. *See State v. Tisius*, 92 S.W.3d 751, 767–68 (Mo. banc 2002). In order to be sufficient, "[a]n offer of proof must show three things: 1) what the evidence will be; 2) the purpose and object of the evidence; and 3) each fact essential to establishing the admissibility of the evidence." *Id.* at 767 (footnote omitted). The offer of proof here meets none of these requirements.

The only specific question posed by defense counsel to DeLong was whether he "made any threats to Mr. Lingle during the course of the events of January the 19th, 1999?" The record does not show what testimony counsel expected DeLong to give in response to this question. Even if we assume that the question was intended to elicit a confirmation of the version of events contained in Defendant's videotaped statement to the police, the question was inadequate. In Defendant's police statement, he related two threats by DeLong. According to Defendant, the first occurred when DeLong threatened to kill him if he did not help murder Vanderhoef. The second occurred after the pair returned to Joplin when DeLong threatened to kill Defendant if he told anyone what they had done. Because defense counsel's question was broad enough to encompass both incidents, the anticipated answer could not simply be inferred from the question.[9] Defense counsel's subsequent inquiry whether there were any questions DeLong would be willing to answer "about the events that took place on January the 19th, 1999, and the days following" was even more nonspecific. Thus, there was no sufficient showing of what DeLong's intended testimony would be.

There also was no explanation of what the purpose and object of DeLong's testimony was or why it was admissible. Assuming the testimony Defendant sought to elicit from DeLong concerned a threat to kill Defendant if he did not provide assistance during the commission of Vanderhoef's murder, we fail to see the relevancy and materiality of this testimony. Duress is not a defense to murder in this state.

---

§ 556.036.2(1). At the time DeLong was called to testify for Defendant, the statute of limitations for this offense had not expired.

9. There is no contention by Defendant that testimony concerning this second threat, which occurred well after all of the murders had been committed, would have been relevant or admissible at trial on any issue.

See § 562.071.2(1); *State v. Juarez*, 26 S.W.3d 346, 362–63 (Mo.App.2000).

On appeal, Defendant argues DeLong's testimony was relevant because "it might have supported [Defendant's] diminished capacity defense." Since this argument was not presented to the trial court during the offer of proof involving DeLong, we decline to consider it. *See State v. Winfield*, 5 S.W.3d 505, 515 (Mo. banc 1999). Furthermore, we find this argument unconvincing for two reasons.

First, Defendant did submit the defense of diminished capacity to the jury. At trial, this defense was supported by the testimony of an expert psychologist, Dr. Thomas Blansett. Dr. Blansett opined that Defendant lacked the capacity to coolly reflect on helping murder Vanderhoef. During Dr. Blansett's testimony, he related to the jury the factual information upon which he based his opinion concerning Defendant's mental condition. Dr. Blansett had reviewed the information contained in Defendant's videotaped police statement, and it supported his opinion. Blansett also conducted his own interviews of Defendant. The purpose of the interviews was to determine "what [Defendant's] state of mind was, whether or not he felt threatened at all—you know—those kinds of things." During one interview with Blansett, Defendant said he only assisted DeLong in murdering Vanderhoef because DeLong threatened to kill Defendant if he did not help. Therefore, the DeLong threat information was presented to the jury both through Defendant's videotaped police statement and Dr. Blansett's testimony. The absence of direct corroboration of this threat information from DeLong's own mouth did not, in any way, preclude Dr. Blansett from reaching or effectively supporting an opinion on Defendant's diminished capacity.

Second, we find Defendant's assertion that he needed DeLong's testimony for this purpose highly suspect because, at the conclusion of the trial, Defendant offered five instructions which directly submitted duress as a defense to murder. In conjunction with the offer of these proposed instructions, defense counsel made the following statement to the trial court:

> I recognize that the statute and, in fact, the Notes on Use indicate that duress shall not be a defense to the crime of murder. And it's my position, in spite of the Notes on Use and in spite of the statute that that law is incorrect and that it's unconstitutional and that it denies Bobby Lingle the right to present a defense in this case, I think the notion that an individual should be subject to being killed, himself, when threatened with that so that he should die instead of aiding or encouraging somebody who is—has threatened him to do so is evidence that's important for the jury to hear. It's important for them to consider that as it relates to the events that took place in this case. And denying the submission of this direct instruction denies the rights under the Fourth, Sixth, and Fourteenth Amendments under the United States Constitution and Article I, Sections 10 and 18–A of the Missouri Constitution and all of the other grounds that are previously set forth in the stipulation we've filed with the Court as to the constitutional protections that Mr. Lingle enjoys.

The trial court refused to give the instructions. Defendant carried forward his constitutional challenge to § 562.071 in his motion for new trial, but he abandoned the issue by not including it as a part of his appeal. *See Bergman v. Mills*, 988 S.W.2d 84, 88 (Mo.App.1999). Based upon the record before us, we conclude Defendant actually sought to introduce DeLong's testimony as substantive evidence to support

a constitutional challenge to our state statute precluding the use of duress as a defense to murder, rather than to support a diminished capacity defense.

For all of the foregoing reasons, we hold that the trial court committed no error in denying Defendant's request that DeLong be compelled to testify. The record supports the trial court's factual determination that DeLong would not have testified even if ordered to do so. Likewise, there was a rational basis for the court's conclusion that DeLong sufficiently invoked his privilege against self-incrimination and that his trial testimony could tend to incriminate him. Finally, Defendant's offer of proof was insufficient to establish what DeLong's testimony would have been and why such testimony was relevant and material to the issues in Defendant's case. We deny Defendant's first point on appeal.

## B. Point II

In Defendant's second point, he contends the trial court erred in denying a motion for mistrial made during closing argument. The motion was made because of the following argument the prosecutor made to the jury:

[Defendant] wants to say that he's scared. And he tries to get—give [the police interrogator] the impression on the videotape that he's scared because in that house, DeLong supposedly threatened to kill him if he didn't help with [Vanderhoef]. Well, keep in mind that that had nothing to do with the murders of the kids because there's no comment or any threat that's ever been made before that moment in time.

And I'd suggest to you, ladies and gentlemen, that you should—that statement is self-serving because he wants to say he's scared because he helped because—with [Vanderhoef] because he told them that he didn't do it because

he'd kill me, too. What's—is that reality?

You heard from the big picture that the two guys were friends. And up to this point in time, [Defendant's] done everything that he's agreed to do. And you have to be skeptical about that reason that the defendant is scared when he goes to—through that videotape and said that on other occasions that I'm scared because I could be charged with murder. This guy coolly reflected about what he did, what the consequences could be.

Then, later in the tape, he said: I was scared because—to be honest with you, I'm scared because I didn't want to go to prison. And then later on, he says, toward the end of the tape: I'm not scared of anything.

I think, if you look at the big picture, this Defendant agreed to come up to Springfield and aid in the murders of five people for some methamphetamine. . . .

Defense counsel made no contemporaneous objection to this argument.

After the foregoing comments were made, the prosecutor concluded the first portion of the State's closing argument by elaborating on this "big picture" theme for several more minutes. After the prosecutor finished his argument, defense counsel approached the bench and moved for a mistrial. Counsel contended the State should not have been permitted to describe as "self-serving" Defendant's statement that he participated in Vanderhoef's murder only because he had been threatened with death by DeLong. Counsel said the State's argument was improper because Defendant had not been permitted to introduce corroborative evidence that this death threat had, in fact, been made. The only relief requested was a mistrial, which the trial court denied.

### 1. Standard of Review

We first address the proper standard of review. Defendant claims he preserved this issue for review by requesting a mistrial at the conclusion of the State's argument and thereafter including this alleged error in his motion for new trial. We disagree because Defendant did not interpose a timely objection to the argument about which he complains on appeal.

In order to preserve for appellate review a complaint about improper jury argument, a defendant must object at the time the argument is made. *State v. Muthofer*, 731 S.W.2d 504, 509–10 (Mo.App.1987). Failure to object "at the earliest opportunity" constitutes a waiver of the claim that the argument was erroneous. *State v. Cosby*, 976 S.W.2d 464, 467 (Mo.App.1998); *see also State v. Samuels*, 88 S.W.3d 71, 83 (Mo.App.2002) (failure to object to closing argument at the time it is made to the jury results in a waiver of any right to complain on appeal). Therefore, when counsel does not object to an allegedly improper argument at the time it is made, the error is not preserved for review. *Sandy Ford Ranch, Inc. v. Dill*, 449 S.W.2d 1, 7 (Mo.1970).

The purpose for the rule requiring an objection to improper argument at the earliest opportunity is simple. "If a party believes that remarks may prejudice his cause, he should object immediately and afford the court an opportunity to correct any erroneous impression. . . ." *State v. McCullough*, 411 S.W.2d 79, 81 (Mo.1967); *see also State v. Newman*, 699 S.W.2d 29, 32 (Mo.App.1985) (an objection must be lodged at the earliest opportunity so the trial court may take corrective action). Compliance with this rule is essential because "an admonition to the jury is usually sufficient to cure any prejudicial effect of prosecutorial comments." *State v. Clark*, 913 S.W.2d 399, 405 (Mo.App.1996).

We agree with the State that a contemporaneous objection and a proper request for relief are essential predicates to appellate review of matters arising from closing argument of counsel. *State v. Hayes*, 624 S.W.2d 16, 19–20 (Mo.1981); *State v. Garner*, 760 S.W.2d 893, 901 (Mo.App.1988). Since Defendant did not move for a mistrial until after the State concluded the first portion of its closing argument, this alleged error was not preserved for review. *See State v. Fondren*, 810 S.W.2d 685, 687 (Mo.App.1991); *State v. Meade*, 736 S.W.2d 473, 474–75 (Mo.App.1987); *Muthofer*, 731 S.W.2d at 509–10; *State v. Harper*, 637 S.W.2d 342, 346 (Mo.App. 1982); *State v. Sales*, 610 S.W.2d 652, 655–56 (Mo.App.1980); *State v. Whites*, 538 S.W.2d 70, 72–73 (Mo.App.1976). In each of these cases, a motion for mistrial first made at the conclusion of the State's opening statement or closing argument was held insufficient to preserve for appellate review a claim of error based on a prosecutor's allegedly improper comments.

Improper comments made by the State during closing argument that are not preserved by a timely objection can only be reviewed for plain error pursuant to Rule 30.20. *State v. Payne*, 126 S.W.3d 431, 444 (Mo.App.2004). Therefore, we exercise our discretionary authority to review Defendant's second point for plain error. *See State v. Small*, 873 S.W.2d 895, 899 (Mo.App.1994).

### 2. The Trial Court Did Not Err in Denying Defendant's Motion for a Mistrial

Relief should rarely be granted on assertions of plain error committed during closing arguments. *State v. Barnett*, 980 S.W.2d 297, 306 (Mo. banc 1998); *State v. Silvey*, 894 S.W.2d 662, 670 (Mo. banc 1995). "To reverse a conviction un-

der plain error review on a claim of improper closing argument, a defendant must establish not only that the argument was improper, but that it had a decisive effect on the outcome of the trial and would amount to a manifest injustice or miscarriage of justice if the error were left uncorrected." *State v. Anderson,* 79 S.W.3d 420, 439 (Mo. banc 2002). Measured by this standard, we find no plain error occurred. Indeed, we find no error, plain or otherwise, in the prosecutor's argument.

The principal contested issue in this case was whether Defendant deliberated prior to participating in the murders of Vanderhoef and her children. Deliberation is defined by § 565.002(3) as "cool reflection for any length of time no matter how brief[.]" The jury was shown the videotaped statement that Defendant gave to the police. In this statement, Defendant admitted that the night before Vanderhoef and her children were killed, he agreed to participate in the murders after DeLong offered to give Defendant an "8 ball" of methamphetamine. This evidence certainly was sufficient to prove deliberation. In a later portion of Defendant's police statement, however, he also said he only helped murder Vanderhoef after he was threatened with death by DeLong. Thus, it was up to the jury to decide whether Defendant participated in killing Vanderhoef because he was offered drugs or because he was threatened with death.

■ It is axiomatic that in resolving conflicts in the evidence, a jury is not bound to accept a defendant's self-serving claims or explanations about what occurred. *See State v. Hayes,* 88 S.W.3d 47, 58 (Mo.App.2002); *State v. Gilpin,* 954 S.W.2d 570, 579 (Mo.App.1997). It was the jury's prerogative to determine which portion of Defendant's videotaped statement to accept or reject. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). To

assist the jury in making this decision, it was entirely appropriate for the prosecutor to comment on the evidence, suggest reasonable inferences that could be drawn therefrom, and disparage the credibility of the Defendant's version of events. *See State v. Edwards,* 116 S.W.3d 511, 538 (Mo. banc 2003); *State v. Hall,* 982 S.W.2d 675, 683 (Mo. banc 1998); *State v. Slankard,* 74 S.W.3d 271, 275 (Mo.App.1999). In doing so, it was permissible for the prosecutor to "even belittle and point to the improbability and untruthfulness of specific evidence." *State v. Kreutzer,* 928 S.W.2d 854, 872 (Mo. banc 1996).

We have set out at length the prosecutor's argument so the challenged remark can be reviewed in context. We believe this argument merely provided the jury with the State's view of why the evidence was sufficient to support a finding of deliberation as to the children and Vanderhoef. First, the prosecutor correctly pointed out that Defendant was not forced to participate in the children's murders because of any threat against his life. Second, the prosecutor noted that Defendant's police statement offered two conflicting explanations for why he helped murder Vanderhoef: (1) to get methamphetamine; or (2) to avoid being killed by DeLong. We reject Defendant's assertion that the characterization of this latter explanation as "self-serving" was intended by the prosecutor to suggest a lack of corroboration, rather than a lack of credibility. The dictionary definition of "self-serving" is "serving one's own interests often in disregard of the truth or the interests of others." Webster's New Collegiate Dictionary (G & C Merriam Co.1976). The prosecution's argument attacked, in this very fashion, Defendant's contention that he did not deliberate before helping murder five people. We deny Defendant's second point on appeal.

We find no merit in any of the arguments advanced by Defendant to support his first and second points on appeal. Therefore, the trial court's judgment of convictions and sentences is affirmed.

RAHMEYER, C.J., P.J., and SHRUM, J., Concur.